3:26 MJ 427(SDV)

### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| In the Matter of the Application of the United States of America for a Search and Seizure Warrant for the Premises Known and Described as ▮Chestnut Street ▮▮▮▮▮Danbury, CT 06810 and Any Closed Containers/Items Contained Therein, <br> USAO Reference No. 2026R00122 | **TO BE FILED UNDER SEAL** <br><br> **Agent Affidavit in Support of Application for Search and Seizure Warrant** |

DISTRICT OF CONNECTICUT) ss.:

MICHAEL FANELLI, Postal Inspector, U.S. Postal Inspection Service ("USPIS") being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1.      I have been employed by USPIS since October 2025. Previously, I was employed from April 2022 to October 2025 by the United States Treasury Department, Internal Revenue Service, Criminal Investigation as a Special Agent. Over the course of my career as a law enforcement officer, I have participated in numerous investigations of financial crime, including cases involving bank fraud, check fraud, and money laundering, and have become familiar with some of the ways in which financial fraudsters and money launders operate. I have participated in the execution of search warrants involving physical premises and electronic evidence.

2.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises specified below (the "Subject Premises") for, and to seize, the items and information described in Attachment A. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of

2

01.22.2026

electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

**B. The Subject Premises**

3.    The Subject Premises are particularly described as the residence located at ██Chestnut Street ██████ █Danbury, CT 06810. The residence located at this address is an approximately three-story row townhouse with gray exterior siding and white-framed windows. The first floor of the building has a blue door, which is marked with a black number 2, and a white garage door leading to the in-building car garage. A photo of the exterior of the Subject Premises, as of March 31, 2026, is included below.



3

01.22.2026

## C.  The Subject Offenses

4.      For the reasons detailed below, I submit that there is probable cause to believe that the Subject Premises contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1343 (wire fraud); 1344 (bank fraud); 1349 (conspiracy to commit wire and bank fraud); 1956(a)(1)(B)(i) (money laundering); and 1956(h) (conspiracy to commit money laundering) (the "Subject Offenses").  Specifically, JORGE ENRIQUE JORGE LUCIANO and others known and unknown have been operating a fraud and money laundering scheme involving the deposit of counterfeit checks into the accounts of coconspirators held at numerous financial institutions.  Subsequently, available funds obtained from these counterfeit check deposits have been withdrawn in cash, transferred to other accounts, and/or used to make purchases and pay expenses, resulting in losses to the financial institutions providing the accounts that received the counterfeit checks.

## II.  Probable Cause

### A.  Probable Cause Regarding Subjects' Commission of the Subject Offenses

#### 1.  Overview of the Scheme

5.      Based on my investigation, I believe that, since on or about April 20, 2022 through the present, JORGE ENRIQUE JORGE LUCIANO and others known and unknown have been operating a fraud and money laundering scheme involving the deposit of manufactured checks into the accounts of recruited coconspirators held at numerous financial institutions.  Subsequently, available funds obtained from these counterfeit check deposits have been withdrawn in cash, transferred to other accounts, and/or used to make purchases and pay expenses, resulting in losses to the financial institutions providing the accounts that received the counterfeit checks.

6.      It is my understanding that the mechanics of this scheme require a steady supply of accounts held at financial institutions that lack a history of over-drafting balances and other red

4

01.22.2026

flags of financial misconduct as the financial institutions are more likely to release into such accounts some or all of funds associated with deposited checks before the checks are verified as legitimate. JORGE ENRIQUE JORGE LUCIANO and others known and unknown were then able to transfer, spend, or otherwise use these advanced funds, resulting in an eventual loss to the financial institutions when the deposited checks were confirmed to be illegitimate and so were not paid out from the purported check maker's account.

7.    It is my belief that, at least in part, to effect the conspiracy by recruiting individuals with accounts in good standing at financial institutions, JORGE ENRIQUE JORGE LUCIANO and others known and unknown have been posting to two Instagram accounts, "thekingdepositcheck" ("Social Media Page-1") and "the_king_deposit_la_bestia" ("Social Media Page-2", and, collectively, the "Social Media Pages"), images and videos advertising the proceeds of their fraud and money laundering scheme, including, for instance, confirmations of high value check deposits, balance inquiries showing a large amount of available funds, withdrawal slips, and stacks of cash. The posts to the Social Media Pages include explicit messages requesting that individuals holding accounts at specific financial institutions reach out if they are interested in access to quick cash and a 50/50 share of proceeds.

a.    Based on my review of the Social Media Pages, posts indicative of involvement in or reflecting evidence and fruits of the Subject Offenses appear throughout the full history of public posts on the Social Media Pages, dating back to at least on or about April 20, 2022.

b.    For instance, the earliest posts to Social Media Page-1 are dated on or about April 20, 2022. These posts depict an approximate $2,800.00 deposit to one bank account and an approximate $841.00 check deposit to a second bank account. Included in these posts were

5

01.22.2026

Spanish language captions, which I understand to mean in substance and in part, "Send your login, don't miss the opportunity," and "Santander fast cash in 1 to 3 hours," respectively.

 

    c.    Accordingly, based on my training, experience, and participation in this investigation, I believe that activity indicative of participation in the Subject Offenses appears on the Social Media Pages dating back to at least on or about April 20, 2022

    8.    Based on my review of bank and financial records, I understand that, since on or about April 20, 2022 through the present, JORGE ENRIQUE JORGE LUCIANO and others known and unknown have as part of the charged scheme deposited counterfeit checks into and made transactions involving accounts at numerous financial institutions in excess of approximately $1.5 million.

## 2. Control of the Social Media Pages

    9.    Based on my review of law enforcement and government records, I am familiar with the physical appearance of JORGE ENRIQUE JORGE LUCIANO and can identify him in photographs, videos, and other media. In particular, I am aware that, among other things, JORGE LUCIANO has a distinctive tattoo of a rose and stylized script words on his right forearm and hand

01.22.2026

10. Based on my review of law enforcement and account records, I understand that JORGE ENRIQUE JORGE LUCIANO lives at the Subject Premises with a particular female ("Individual-1").

11. Based on my review of account records, I am aware that JORGE ENRIQUE JORGE LUCIANO holds personal checking and savings accounts in his name at a financial institution ("Financial Institution-1"). One such account ends in -9425 and is jointly held with Individual-1 (the "JORGE LUCIANO Joint Account").

12. Based on my review of account records, I am aware that the Social Media Pages are linked to identifiers, including phone numbers and email addresses, associated with JORGE ENRIQUE JORGE LUCIANO.

13. Based on my review of activity on and posts to the Social Media Pages, I am aware that the individual appearing to post on and control the Social Media Pages shares the same distinctive tattoo as JORGE ENRIQUE JORGE LUCIANO.

14. Accordingly, based on my training, experience, and participation in this investigation, I believe that JORGE ENRIQUE JORGE LUCIANO posts to and controls the Social Media Pages.

### 3. Account-1 Transactions

15. Based on my review of bank and transaction records, social media records, and surveillance footage, I have learned that, in or about September 2025, JORGE ENRIQUE JORGE LUCIANO deposited approximately four counterfeit checks, purportedly worth an approximate total of $77,731.49 and drawn on an account held in the name of a New York State government entity ("Victim-1"), into an account ending in -7421 ("Account-1") held at a financial institution ("Financial Institution-2"). Based on my review of account records, I understand that Account-1 was held in the name of an entity located in Yonkers, New York and that JORGE LUCIANO was

7

neither listed as a signer on nor was otherwise formally associated with the account. However, I am aware that, after Financial Institution-2 released a portion of the funds associated with the checks deposited into this account, JORGE LUCIANO and others known and unknown transferred, withdrew, and otherwise spent approximately $63,000.00 of the released funds, resulting in a loss to Financial Institution-2. Specifically, from my investigation, I have learned that:

a.      On or about September 9, 2025, Account-1 had a balance of negative $7.72.

b.      On or about September 11, 2025 at approximately 7:15 p.m., a counterfeit check, which was worth approximately $15,470.00 and drawn on Victim-1's account, was deposited into Account-1 via an ATM in New York, New York. Then, at approximately 7:18 p.m., a $1,500.00 cash withdrawal from Account-1 was conducted via the same ATM. Surveillance footage gathered from this ATM shows that JORGE LUCIANO, identifiable by, among other things, his distinctive tattoo, conducted the check deposit and cash withdrawal. Still images from this surveillance footage are included below.

 

c.      On or about September 12, 2025, Social Media Page-1 posted images and videos showing JORGE LUCIANO, identifiable by, among other things, his distinctive tattoo,

8

01.22.2026

accessing Account-1 via an ATM, conducting a cash withdrawal for approximately $1,500.00, and possessing a stack of cash. Included in these posts were Spanish language comments, which I understand to mean in substance and in part, "I found it so you guys could look nice. It's available now. 3k out the door already." Still image excerpts from certain of these posts are included below.

 

d.      On or about September 12, 2025 at approximately 1:22 p.m., a counterfeit check, which was worth approximately $29,890.89 and drawn on Victim-1's account, was deposited into Account-1 via an ATM in New York, New York. Surveillance footage gathered from this ATM shows that JORGE LUCIANO, identifiable by, among other things, his distinctive tattoo, conducted the deposit. A still image from this surveillance footage is included below.

9

01.22.2026



e.      On or about September 12, 2025, a cash withdrawal for approximately $1,500.00 from Account-1 was conducted via an ATM in Ridgefield, Connecticut.

f.      On or about September 13, 2025, Social Media Page-2 posted images and videos showing JORGE LUCIANO, identifiable by, among other things, his distinctive tattoo, accessing Account-1 via an ATM, conducting a cash withdrawal for approximately $1,500.00, and possessing a stack of cash. Included in these posts were Spanish language comments, which I understand to mean in substance and in part, "In real time. Almost next day 30k. In 2 days 45k" and "45k in 2 days." Still image excerpts from certain of these posts are included below.




10

01.22.2026

g.    On or about September 14 and 15, 2025, purchases over approximately $2,100.00 were made from a Walmart in Danbury, Connecticut using a debit card associated with Account-1. The items purchased included a Nintendo Switch console with the serial number XTW50900012504. Surveillance footage shows JORGE LUCIANO making these purchases. Still images from this surveillance footage are included below.

 

h.    On or about September 15, 2025 at approximately 5:13 p.m., a counterfeit check, which was worth approximately $17,820.70 and drawn on Victim-1's account, was deposited into Account-1 via an ATM in New York, New York. Surveillance footage gathered from this ATM shows that JORGE LUCIANO, identifiable by, among other things, his distinctive tattoo, conducted the deposit. A still image from this surveillance footage is included below.

11

01.22.2026



i.      On or about September 15, 2025, an approximate $1,500.00 cash withdrawal from Account-1 was conducted via an ATM in Ridgefield, Connecticut.

j.      On or about September 15, 2025, an electronic transfer of approximately $4,950.00 was made from Account-1 to the JORGE LUCIANO Joint Account.

k.      On or about September 16, 2025 at approximately 7:28 p.m., a counterfeit check, which was worth approximately $14,540.90 and drawn on Victim-1's account, was deposited into Account-1 via an ATM in Ridgefield, Connecticut. Then, approximately two minutes later, a $1,500.00 cash withdrawal from Account-1 was conducted from the same location. Surveillance footage gathered from this location shows that JORGE LUCIANO, identifiable by, among other things, his distinctive tattoo, conducted the check deposit and cash withdrawal. Still images from this surveillance footage are included below.

12

01.22.2026



l.      On or about September 16, 2025, Social Media Page-2 posted images and videos showing JORGE LUCIANO, identifiable by, among other things, his distinctive tattoo, accessing Account-1 via an ATM, conducting a cash withdrawal for approximately $1,500.00, and posting the transaction receipt. Included in these posts were Spanish language comments, which I understand to mean, in substance and in part, "I want [Financial Institution-2], young guys. The King said personal and business for 15k & 65k" and "This is not a child's game. 63k in 3 days. Young guys, get yourself that [Financial Institution-2] in New York." Still image excerpts from certain of these posts are included below.

13

01.22.2026



m.    On or about September 16, 2025, an electronic transfer of approximately $4,950.00 was made from Account-1 to the JORGE LUCIANO Joint Account.

n.    On or about September 16, 2025, an electronic payment of approximately $139.54 was made from Account-1 to an internet service provider. Internet service provider records demonstrate that this payment resolved a balance on the internet service provider account associated with Address-1.

o.    All four check deposits were subsequently reversed by Financial Institution-2.

p.    Based on my communications with a representative of Victim-1, I understand that all four deposited checks were counterfeit, meaning manufactured in whole and not the product of alterations made to otherwise legitimate checks.

### 4. Account-2 Transactions

16.    Based on my review of bank and transaction records, social media records, and surveillance footage, I have learned that JORGE ENRIQUE JORGE LUCIANO deposited approximately four counterfeit checks, purportedly worth an approximate total of $142,592.99 and

14

01.22.2026

drawn on an account held in the name of Victim-1, into an account ending in -7271 ("Account-2") held at a financial institution ("Financial Institution-3"). Based on my review of account records, I understand that Account-2 was held in the name of an individual that lived in York, Pennsylvania and that JORGE LUCIANO was neither listed as a signer on nor was otherwise formally associated with the account. However, I am aware that, after Financial Institution-3 released a portion of the funds associated with the checks deposited into this account, JORGE LUCIANO and others known and unknown transferred, withdrew, and otherwise spent at least approximately $8,000.00 of the released funds, resulting in a loss to Financial Institution-3. Specifically, from my investigation, I have learned that:

a.      On or about September 29, 2025 at approximately 11:40 a.m., a counterfeit check, worth approximately $17,820.89 and drawn on Victim-1's account, was deposited into Account-2 via an ATM in York, Pennsylvania. Surveillance footage gathered from the deposit location shows that JORGE LUCIANO, identifiable by the distinctive tattoo on his hand, conducted the deposit, conducted the deposit. The next day, Social Media Page-1 posted a video showing a Financial Institution-3 receipt of a September 29, 2025 check deposit of approximately $17,820.89. Included in one of these posts was a Spanish language comment, which I understand to mean, in substance and in part, "I want Pennsylvania." Still images from this surveillance footage and this post are included below.

15

01.22.2026

 

    b.    On or about September 30, 2025, an electronic Zelle transfer of approximately $1,000.00 was made from Account-2 to the JORGE LUCIANO Joint Account.

    c.    On or about September 30, 2025 at approximately 9:52 a.m., a cash withdrawal, worth approximately $14,000.00, was conducted from Account-2.

    d.    On or about September 30, 2025 at approximately 9:51 p.m., a counterfeit check, worth approximately $15,550.90 and drawn on Victim-1's account, was deposited into Account-2 via an ATM in York, Pennsylvania. A few days later, on or about October 2, 2025, Social Media Page-1 posted an image showing a Financial Institution-3 receipt being held in front of an ATM and reflecting the September 30, 2025 check deposit of approximately $15,550.90. Surveillance footage gathered from the location of this check deposit shows that JORGE LUCIANO, identifiable by his distinctive tattoo, conducted the check deposit and also shows JORGE LUCIANO using his cellphone to take a photograph of the check deposit transaction receipt with the ATM in the background. Still images from this surveillance footage and this post are included below.

16

01.22.2026



e.      On or about October 2, 2025 at approximately 6:33 p.m., a counterfeit check, worth approximately $33,750.30 and drawn on Victim-1's account, was deposited into Account-2 via an ATM in York, Pennsylvania.

f.      On or about October 4, 2025 at approximately 10:04 a.m., an official check, worth approximately $8,995.00, was drawn on Account-2 and made out to JORGE LUCIANO.

g.      On or about October 4, 2025 at approximately 10:06 a.m., a cash withdrawal, worth approximately $5,000.00, was conducted from Account-2.

h.      On or about October 7, 2025 at approximately 2:55 p.m., a counterfeit check, worth approximately $75,470.90 and drawn on Victim-1's account, was deposited into Account-2 via an ATM in York, Pennsylvania. Surveillance footage gathered from the deposit location shows that JORGE LUCIANO, identifiable by the distinctive tattoo on his hand, conducted the deposit. The next day, Social Media Page-1 posted an image showing a Financial Institution-3 receipt of an October 7, 2025 check deposit of approximately $75,470.90. Included in these posts were Spanish language comments, which I understand to mean, in substance and in part, "The only company that spends a whole week hammering away at a single account. You

17

01.22.2026

know how it is, we'll talk at 12 a.m." Still images from this surveillance footage and this post are included below.

 

    i.     At least three of the check deposits were subsequently reversed by Financial Institution-3.

    j.     Based on my communications with a representative of Victim-1, I understand that the deposited checks were entirely fraudulent, manufactured in whole and not the result of altering otherwise legitimate checks.

### 5. Account-3 Transactions

17.    Based on my review of bank and transaction records, social media records, and surveillance footage, I have learned that, on or about October 14, 2025, JORGE ENRIQUE JORGE LUCIANO, the defendant, deposited approximately one counterfeit check, worth approximately $27,970.90 and drawn on an account held in the name of Victim-1, into an account ending in -7178 ("Account-3") held at a financial institution ("Financial Institution-4"). Based on my review of account records, I understand that Account-3 was held in the name of an individual that lived in Central Islip, New York and that JORGE LUCIANO was neither listed as a signer on nor was otherwise formally associated with the account. However, I am aware that, after Financial

18

01.22.2026

Institution-4 released a portion of the purportedly deposited funds into this account, JORGE LUCIANO and others known and unknown transferred, withdrew, and otherwise spent approximately $23,500.00 of the released funds, resulting in a loss to Financial Institution-4. Specifically, from my investigation, I have learned that:

    a.    On or about October 14, 2025 at approximately 6:10 p.m., a counterfeit check, worth approximately $27,970.90 and drawn on Victim-1's account, was deposited into Account-3.

    b.    On or about October 21, 2025, two cash withdrawals, worth approximately $9,400.00 and $2,000.00 respectively, were conducted from Account-3 in a New York, New York branch location of Financial Institution-4.

    c.    On or about October 21, 2025, an official check, worth approximately $5,594.00, was drawn on Account-3 and made out to JORGE LUCIANO.

    d.    On or about October 21, 2025, an official check, worth approximately $6,478.00, was drawn on Account-3 and made out to Individual-1.

    e.    On or about October 21, 2025, Social Media Page-1 posted a video showing the Financial Institution-4 mobile banking application for Account-3, which listed the above described check deposit, cash withdrawals, and official check purchases.

19

01.22.2026



f.    On or about October 24, 2025, the official check, which was made out to Individual-1 and worth approximately $6,478.00, was deposited into the JORGE LUCIANO Joint Account.

g.    Based on my communications with a representative of Victim-1, I understand that the check deposited on or about October 14, 2025 was entirely fraudulent, manufactured in whole and not the result of altering an otherwise legitimate check.

### 6. Account-4 Transactions

18.    Based on my review of bank and transaction records, social media records, and surveillance footage, I have learned that, in or about November 2025, JORGE ENRIQUE JORGE LUCIANO deposited approximately two counterfeit checks, totaling approximately $45,648.01 and drawn on an account held in the name of Victim-1, into an account ending in -0635 ("Account-4") held at Financial Institution-2.    Based on my review of account records, I understand that Account-4 was held in the name of an individual who lived in the Bronx, New York and that JORGE LUCIANO was neither listed as a signer on nor was otherwise formally associated with the account.    However, I am aware that, after Financial Institution-2 released a portion of the purportedly deposited funds into this account, JORGE LUCIANO and others known

20

and unknown transferred, withdrew, and otherwise spent approximately $20,000.00 of the released funds, resulting in a loss to Financial Institution-2. Specifically, from my investigation, I have learned that:

a.    On or about November 12, 2025, a counterfeit check, worth approximately $15,922.86 and drawn on Victim-1's account, was deposited into Account-4 via an ATM in New York, New York.

b.    On or about November 13, 2025, two cash withdrawals, worth approximately $1,500.00 and $9,800.00 respectively, were conducted from Account-4.

c.    On or about November 13, 2025, a counterfeit check, worth approximately $29,725.15 and drawn on Victim-1's account, was deposited into Account-4 via an ATM in White Plains, New York.

d.    On or about November 13, 2025, an electronic payment of approximately $188.18 was made from Account-4 to a to an internet service provider. Internet service provider records demonstrate that this payment resolved a balance on the internet service provider account associated with Address-1.

e.    On or about November 14, 2025, a cash withdrawal, worth approximately $1,500.00, was conducted from Account-4 via an ATM in Ridgefield, Connecticut.

f.    On or about November 15, 2025, Social Media Page-2 posted two images showing Account-4's balance in the Financial Institution-2 mobile banking application as well as the receipt of a cash withdrawal, worth approximately $1,500.00, from Account-4.

21

 

g.    The two check deposits were subsequently reversed by Financial Institution-2.

h.    Based on my communications with a representative of Victim-1, I understand that the two deposited checks were entirely fraudulent, manufactured in whole and not the result of altering an otherwise legitimate check.

*              *              *

19.    I understand that, on or about April 14, 2026, the Government has submitted to the Honorable Judith C. McCarthy, Chief United States Magistrate Judge, Southern District of New York, a complaint and arrest warrant, charging JORGE ENRIQUE JORGE LUCIANO with conspiracy to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Section 1349, wire fraud, in violation of Title 18, United States Code, Section 1343, and bank fraud, in violation of Title 18, United States Code, Section 1344. Accordingly, I anticipate that JORGE LUCIANO will be a "person to be arrested" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure at the time of a search authorized by this warrant.

22

01.22.2026

### B. Probable Cause Justifying Search of the Subject Premises

20. Based on my training and experience as well as my participation in this investigation, I believe that there is probable cause to conclude that the Subject Premises contain evidence, fruits, and instrumentalities of violations of the Subject Offenses.

21. As an initial matter, I believe that JORGE ENRIQUE JORGE LUCIANO resides at the Subject Premises. In particular:

a. Based on my review of financial account records, I understand that the JORGE LUCIANO Joint Account listed the Subject Premises as its associated address.

b. Based on my review of telecommunications records, I understand that Individual-1's telecommunications account lists its address as the Subject Premises.

c. Based on my review of internet service provider records, I understand that JORGE LUCIANO's internet service provider account lists its address as the Subject Premises.

d. Based on my review of internet service provider records, I understand that payments have been made from Account-1 and Account-3 to the internet service provider account associated with JORGE LUCIANO and the Subject Premises to pay for services rendered.

e. Based on my review of subscriber and IP records, I understand that the Nintendo Switch console with the serial number XTW50900012504 connected to the internet using an IP address assigned to the internet service provider account associated with JORGE LUCIANO and the Subject Premises.

22. Consistent with his residing at the Subject Premises, based on my review of motor vehicle records and my participation in this investigation, I am aware that JORGE ENRIQUE JORGE LUCIANO's vehicle has recently been parked in front of the Subject Premises.

23

01.22.2026

a.  Based on my review of motor vehicle records, I am aware that New York State license plate LZW1837 is registered to JORGE LUCIANO and associated with a gray Toyota four-door sedan.

b.  Based on my observation of the Subject Premise, I am aware that, on or about March 31, 2026, a gray Toyota four-door sedan with New York State license plate LZW1837 was parked in front of the Subject Premise's garage.

23.  Accordingly, based on my review of records from government, financial institutions, and service providers as well as my participation in this investigation, I understand that JORGE ENRIQUE JORGE LUCIANO lives at the Subject Premises.

24.  Based on my review of telecommunications and Apple records, I understand that JORGE ENRIQUE JORGE LUCIANO and Individual-1, who, as set forth above, resides with JORGE LUCIANO, is a joint-holder of the JORGE LUCIANO Joint Account, which received proceeds of the fraud scheme, and was the named recipient of proceeds of the fraud scheme, have and currently possess Apple iPhones.

25.  As described above, the fraud and money laundering scheme operated by JORGE ENRIQUE JORGE LUCIANO and others known and unknown relied on internet-connected electronic communication devices, such as smartphones and computers, to make electronic fund transfers among bank accounts and for communications with co-conspirators. Importantly to this scheme, JORGE LUCIANO and others known and unknown made extensive use of the Social Media Pages, posting photos and videos depicting check deposits, balance inquiries, and cash withdrawals, as a means of recruiting new individuals with untainted bank accounts, which were critical for facilitating the scheme. This activity requires use of electronic communications devices, such as computers and smartphones and JORGE LUCIANO has been specifically

24

01.22.2026

observed using a smartphone in furtherance of the scheme. Specific instances of such devices being used in the scheme and, therefore, comprising evidence, fruits, and instrumentalities of violations of the Subject Offenses, include:

a.    On or about September 30, 2025, an electronic Zelle transfer of approximately $1,000.00, which comprised the proceeds of a counterfeit check deposit, was made from Account-2 to the JORGE LUCIANO Joint Account.

b.    On or about September 30, 2025 at approximately 9:51 p.m., a counterfeit check, worth approximately $15,550.90 and drawn on Victim-1's account, was deposited into Account-2 via an ATM in York, Pennsylvania. A few days later, on or about October 2, 2025, Social Media Page-1 posted an image showing a Financial Institution-3 receipt being held in front of an ATM and reflecting the September 30, 2025 check deposit of approximately $15,550.90. Surveillance footage gathered from the location of this check deposit shows that JORGE LUCIANO, identifiable by his distinctive tattoo, conducted the check deposit and also shows JORGE LUCIANO using his cellphone to take a photograph of the check deposit transaction receipt with the ATM in the background. Still images from this surveillance footage and this post are included below.

 

25

01.22.2026

c.    On or about November 15, 2025, Social Media Page-2 posted two images showing Account-3's balance in the Financial Institution-2 mobile banking application as well as the receipt of a cash withdrawal, worth approximately $1,500.00, from Account-3.

 

26.    Based on my training, experience, and conversations that I have had with other federal agents and law enforcement officers, I am aware of the following:

a.    Individuals engaged in substantive check fraud, bank fraud, and money laundering as well as conspiracies to commit such offenses rely on electronic communications devices, such as computers and smartphones, to conduct deposits, transfers, and withdrawals of fraudulently obtained funds.

b.    Individuals engaged in check fraud, bank fraud, and money laundering conspiracies rely on electronic communications devices, such as computers and smartphones, to recruit new co-conspirators and to communicate with and coordinate with co-conspirators.

c.    Individuals engaged in check fraud, bank fraud, and money laundering offenses may also store information related to the Subject Offenses on electronic communications devices, such as computers and smartphones, including, among other things, counterfeit check images, transaction records, communications and correspondence, and contact lists.

01.22.2026

d.      In cases involving the use of social media, electronic communications devices may contain information related to social media posting, recruitment of new conspirators, and related information, such as posts, images, video, and private communications.

e.      Finally, individuals are generally likely to keep electronic communications devices, especially those containing potentially incriminating information, safely stored in their homes or on their person.

27.    Based on my training, experience, and conversations that I have had with other federal agents and law enforcement officers, I understand that counterfeit checks may be created, for instance, through the use of software run on devices such as computers and smartphones or by ordering such counterfeit checks over the internet.  If the counterfeit checks are created and printed by the user of such devices, that individual may also have an in-home printer and supplies necessary to print checks, such as ink and check paper.

28.    Based on the foregoing, I respectfully submit there is probable cause to believe that JORGE ENRIQUE JORGE LUCIANO engaged in the Subject Offenses, and that evidence of this criminal activity is likely to be found in the Subject Premises.

## C.  Probable Cause Justifying Search of ESI

29.    Based on my training and experience, I know that individuals who engage in check fraud, bank fraud, and money laundering commonly use computers, smartphones, and other electronic devices to, among other things, recruit and communicate with co-conspirators; conduct transactions and track the movement of funds and or proceeds derived from counterfeit checks; create, store, and distribute counterfeit checks; and use and interact with others on social media platforms.  As a result, they often store data on their computers related to their illegal activity, which can include electronic messaging and correspondence; lists of contact information; records

27

01.22.2026

of counterfeit checks as well as fraudulent deposits, transfers, and withdrawals; and photos, videos, and other media posted to social media platforms.

30.     Based on my training and experience, I also know that, where computers are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred. This is typically true because:

- Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

- Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on a home computer, the data contained in the file does not actually disappear, but instead remains on the hard drive, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the computer. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and computer habits.

- In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data. In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

31.     Based on the foregoing, I respectfully submit there is probable cause to believe that JORGE LUCIANO engaged in the Subject Offenses, and that evidence of this criminal activity is likely to be found in the Subject Premises and on computers, smartphones, and other electronic devices found within the Subject Premises.

## III.  Procedures for Searching ESI

### A.  Biometric Unlocking

32.     During the execution of the search of the Subject Premises, law enforcement is authorized to obtain from JORGE ENRIQUE JORGE LUCIANO and Individual-1 (but not any other individuals present at the Subject Premises at the time of execution of the warrant) the

28

compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock electronic devices for the purpose of searching the contents as authorized by this warrant. Law enforcement is authorized to hold a device in front of JORGE LUCIANO's and/or Individual-1's face to unlock devices, but is not authorized to hold open JORGE LUCIANO's and/or Individual-1's eyelids to enable law enforcement to unlock any devices.

33.    While attempting to unlock such electronic devices by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that JORGE ENRIQUE JORGE LUCIANO and Individual-1 state or otherwise provide the password or identify the specific biometric characteristics (such as the unique finger(s) or other physical features) that may be used to unlock the electronic devices. However, voluntary disclosure of such information by JORGE LUCIANO and Individual-1 is permitted. To avoid confusion on this point, if law enforcement is executing the warrant and asks JORGE LUCIANO, Individual-1, or any other persons for the passwords to such electronic devices, or to identify which biometric characteristics (such as the unique finger(s) or other physical features) unlocks such electronic devices, law enforcement will not state or otherwise imply that the warrant requires the person to provide such information. Law enforcement will make clear that providing any such information is voluntary and that the person is free to refuse the request.

**B.  Execution of Warrant for ESI**

34.    Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review." Consistent with Rule 41, this application requests authorization to seize any computer devices and storage media and transport

29

them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

- First, the volume of data on computer devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

- Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of computer hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer, which often take considerable time and resources for forensic personnel to detect and resolve.

## C. Review of ESI

35.    Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

36.    In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

30

01.22.2026

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- scanning storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[1];

- using document review programs, including machine learning enabled software; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the electronic device, or a file, was used.

37.    Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.  Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

38.    Based on my training, experience, discussions with other law enforcement officers, and guidance provided by technicians who perform extractions of devices such as desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and scanners, I have learned the following regarding how individual records are associated with dates in electronic devices: *First*, many records in such devices contain, in their metadata, multiple dates, including a date created, modified, sent, received, etc. *Second*, time zone

---

[1] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

31

settings may be maintained in different formats across different applications. *Third*, users of such devices can manually manipulate time/date metadata, which the reviewing software would not ordinarily detect. *Fourth*, many records in such devices are undated or automatically populate default dates using, for example, an incorrect decade. For these reasons, files on devices can have multiple dates, or be undated. As a result, restrictions on the search of such electronic devices using dates could restrict investigators' ability to identify responsive data and thereby locate evidence of the Subject Offenses. Additionally, certain device records that are evidence of an individual's ownership or use of a device are undated or are relevant irrespective of the time period they were created or modified, and restrictions on search of electronic devices using dates could similarly restrict the identification of responsive data.

**D.   Return of ESI**

39.     If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

01.22.2026

## IV.   Conclusion and Ancillary Provisions

40.    Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

Michael Fanelli

> Digitally signed by
> Michael Fanelli
> Date: 2026.04.14
> 17:07:09 -04'00'

MICHAEL FANELLI
Postal Inspector
U.S. Postal Inspection Service

Sworn to before me through the transmission of this Affidavit by reliable electronic means ( _telephone_ ) _per Rule 4.1_ _SDV_ this _14th_ day of April, 2026.

_SDV_

HON. S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE

33

01.22.2026

## ATTACHMENT A

### I. Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers found therein:

- The residence located at ▉ Chestnut Street ▉▉▉▉▉ Danbury, CT 06810. The residence located at this address is an approximately three-story row townhouse with gray exterior siding and white-framed windows. The first floor of the building has a blue door, which is marked with a black number 2, and a white garage door leading to the in-building car garage. A photo of the exterior of the Subject Premises, as of March 31, 2026, is included below.



### II. Items to Be Seized

#### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises consist of the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1343 (wire fraud); 1344 (bank fraud); 1349 (conspiracy to commit wire and bank fraud); 1956(a)(1)(B)(i) (money laundering); and 1956(h) (conspiracy to commit money laundering) (the "Subject Offenses") described as follows:

1.      Evidence concerning occupancy or ownership of the Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, diaries, statements, identification documents, address books, telephone directories, and keys.

2.      Evidence concerning communications among co-conspirators in furtherance of the Subject Offenses.

3.      Evidence of the Subject Offenses, including but not limited to images of account numbers and identifying details, fraudulent checks, deposit and withdrawal transaction receipts and records, cash proceeds of fraudulent deposits, and the involvement of any individual in this conduct.

4.      Evidence of financial transactions, including but not limited to the use, deposit, receipt, or transfer of funds.

5.      Photographs, videos, audio files, or other multimedia that may constitute evidence of the Subject Offenses, including such multimedia reflecting personal identifying information of third parties, credit card or check information, financial account information.

6.      Evidence of control over and use of accounts with financial institutions, banks, money service business, cryptocurrency platforms, companies, and projects, and/or other such entities regardless of the name listed on the relevant accounts.

7.      Evidence concerning the creation, storage, and distribution of counterfeit checks, including, without limitation, checks and check making supplies, components, and devices, such as printers, check paper, ink, stamps, seals, stickers, and templates.

8.      Evidence of control over and use of accounts on or associated with social media platforms, applications, or communication networks that are used to directly communicate with others or make generalized posts for the purpose of recruiting individuals to participate in the Subject Offenses.

9.      Evidence concerning the proceeds of the Subject Offenses, including but not limited to items purchased with or otherwise acquired by use of such proceeds.

10.     Records, in whatever form, pertaining to accounts held with Internet Service Providers or of Internet use.

11.     Safes, key-lock strong boxes, suitcases, locked cabinets, and other types of locked or closed containers used to secrete and store, books, records, documents, and other items of the sort described in subparagraphs (1) through (10) above.  Law enforcement officers executing this Warrant are specifically authorized to open any such locked safes or containers including, where necessary, by using force

## B.  Search and Seizure of Electronically Stored Information

The items to be seized from the Subject Premises also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, desktop and laptop

2

01.22.2026

computers, tablets, disk drives, thumb drives, personal digital assistants, smartphones, digital cameras, printers, and scanners as well as routers, modems, and network equipment used to connect to the Internet. In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

Included within the items to be seized from the Subject Premises are:

1.    Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.    Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.    Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

4.    Evidence of the Subject Offenses, including but not limited to images of account numbers and identifying details, fraudulent checks, deposit and withdrawal transaction receipts and records, cash proceeds of fraudulent deposits, and the involvement of any individual in this conduct.

5.    Evidence concerning communications in furtherance of the Subject Offenses, including but not limited to public posts to social media platforms and applications to solicit individuals to join the fraud scheme as well as any public comments or private communications, including direct messages, about the fraud scheme as well as media, such as photos and videos, used to create posts.

6.    Evidence demonstrating the state of mind of any involved individual, including from public posts and stores as well as from direct messages with possible recruits and co-conspirators.

7.    Evidence confirming identity of involved individuals, including from information provided to social media platforms and any other application or service at account creation as well as communications and interactions made using social media platforms.

8.    Evidence regarding the geographic location of involved individuals as well as their computer or device on specific dates and times.

9.    Evidence regarding the identities and locations of co-conspirators or victims.

10.    Evidence establishing the timeline of events relevant to the commission of the Subject Offenses.

11.    Information regarding location of other evidence, such as other social media accounts, and/or other linked third-party accounts used in furtherance of the Subject Offenses.

3

01.22.2026

## C.  Review of ESI

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation

- using document review programs, including machine learning enabled software; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections II.A and II.B of this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.  Law enforcement personnel may make copies of the seized devices and storage media, and data stored within, to effectuate their review.

During the execution of the search of the Subject Premises, law enforcement is authorized to obtain from JORGE ENRIQUE JORGE LUCIANO and/or KATHERINE MASSIEL CORDERO PAULINO (but not any other individuals present at the Subject Premises at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock electronic devices described in this Attachment for the purpose of searching the contents as authorized by this warrant. Law enforcement is authorized to hold a device in front of JORGE ENRIQUE JORGE

4

01.22.2026

LUCIANO's and/or KATHERINE MASSIEL CORDERO PAULINO's face to unlock devices, but is not authorized to hold open JORGE ENRIQUE JORGE LUCIANO's and/or KATHERINE MASSIEL CORDERO PAULINO's eyelids to enable law enforcement to unlock any devices.

While attempting to unlock such electronic devices by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that JORGE ENRIQUE JORGE LUCIANO or KATHERINE MASSIEL CORDERO PAULINO state or otherwise provide the password or identify the specific biometric characteristics (such as the unique finger(s) or other physical features) that may be used to unlock the electronic devices. However, voluntary disclosure of such information by JORGE ENRIQUE JORGE LUCIANO and/or KATHERINE MASSIEL CORDERO PAULINO is permitted. To avoid confusion on this point, if law enforcement is executing the warrant and asks JORGE ENRIQUE JORGE LUCIANO and/or KATHERINE MASSIEL CORDERO PAULINO or any other persons for the passwords to such electronic devices, or to identify which biometric characteristics (such as the unique finger(s) or other physical features) unlocks such electronic devices, law enforcement will not state or otherwise imply that the warrant requires the person to provide such information. Law enforcement will make clear that providing any such information is voluntary and that the person is free to refuse the request.

01.22.2026